## GULF, C. & S. F. RY. CO. v. TEXAS & P. RY. CO.

(Circuit Court of Appeals, Fifth Circuit. March 11, 1925. Rehearing Denied and Judgment Amended April 4, 1925.)

No. 4484.

**1. Railroads ⚫➡7—Proposed construction held "industrial track" and not "extension," within statute requiring certificate of authority.**

Proposed track 7½ miles long to cost $510,-000, to be connected with side tracks of five industrial plants and used exclusively for switching and moving freight from such plants, held "industrial track," within Transportation Act 1920, § 402, par. 22 (Comp. St. Ann. Supp. 1923, § 8563), and not "extension," within paragraph 18, and certificate of authority from Interstate Commerce Commission was not required.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Extend —Extension.]

**2. Railroads ⚫➡7—"Industrial track" defined.**

An "industrial track," within Transportation Act 1920, § 402, par. 22 (Comp. St. Ann. Supp. 1923, § 8563), is one connecting with main line track and used and equipped for moving freight in carloads to or from one or more industries thereby reached and served, in incidental services such as loading, reloading, or storing, and in incidental switching or yard movements.

**3. Railroads ⚫➡7—Courts in construing statute cannot consider whether industrial track will cause duplication of service.**

In determining whether proposed construction is "extension" or "industrial track," within Transportation Act 1920, § 402, pars. 18 and 22 (Comp. St. Ann. Supp. 1923, § 8563), court cannot properly consider whether it will cause duplication of railroad service and invested capital in railroad property, since courts cannot give descriptive words in statute narrower meaning than such words customarily had at and prior to date of enactment, to reach same result as would be affected by amendment of statute.

Appeal from the District Court of the United States for the Southern District of Texas; J. C. Hutcheson, Judge.

Suit by the Texas & Pacific Railway Company against the Gulf, Colorado & Santa Fé Railway Company. Decree for plaintiff, and defendant appeals. Reversed and remanded, with directions.

J. W. Terry, of Galveston, Tex., and Thos. J. Norton, of Chicago, Ill. (Terry, Cavin & Mills, of Galveston, Tex., Gardiner Lathrop, Thomas J. Norton, and Homer W. Davis, all of Chicago, Ill., on the brief), for appellant.

T. J. Freeman, of New Orleans, La., and T. D. Gresham, of Dallas, Tex., for appellee.

Before WALKER and BRYAN, Circuit Judges, and DAWKINS, District Judge.

WALKER, Circuit Judge. This is an appeal from a decree which awarded to the appellee, Texas & Pacific Railway Company, an injunction restraining the appellant, Gulf, Colorado & Santa Fé Railway Company, from constructing or operating a proposed addition to the latter's trackage, unless and until the appellant shall first have applied to and obtained from the Interstate Commerce Commission a certificate that the present or future public convenience and necessity require or will require the construction or operation, or construction and operation, of such proposed additional trackage, which the decree called an extension of appellant's line of railroad.

[1] The proposed additional trackage in question was to be located in Dallas county, Tex., between Hale, a station on appellant's Cleburne-Paris Branch, which approaches Dallas, Tex., from the southwest, and an industrial district situated north of said branch and south and alongside of appellee's line of railway, which approaches Dallas from the west, the distance on an air line from Hale to the center of such industrial district being 3¾ miles, but the length of the track from Hale to the point in such industrial district which is nearest to and 1¼ miles from the corporate limits of that part of the city of Dallas called Oak Cliff was to be 7½ miles. The track was to connect with tracks owned by each of five industries located in such district. It was to be used exclusively for switching or moving freight in carloads between those industries and the station at Hale, for which service no charge was to be made; the rates to and from Hale to be applied. The proposed trackage will cost about $510,000. For a detailed description of it and of the surroundings generally, reference is made to the part of the master's report which is set out in the opinion rendered by the District Judge. Lancaster et al. v. Gulf, C. & S. F. Ry. Co. (D. C.) 298 F. 488.

The decision of the case turns upon the meaning to be given to language used in paragraphs 18, 19, 20, and 22, added to section 1 of the act to regulate commerce by section 402 of The Transportation Act 1920. 41 Stat. 456, 477 (Comp. St. Ann. Supp. 1923, § 8563). The paragraphs mentioned provide as follows:

"(18) After ninety days after this paragraph takes effect no carrier by railroad subject to this act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

"(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this act shall apply to all such proceedings. Upon receipt of any application for such certificate the Commission shall cause notice thereof to be given to and a copy filed with the Governor of each state in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned, with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

"(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment

contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the state or states affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both. * * *

"(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one state, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

The contention in behalf of the appellee was that the proposed trackage would be an "extension of its line of railroad" by the appellant, within the meaning of the above quoted paragraph 18. The opposing contention was that the proposed trackage would be an industrial track within the meaning of paragraph 22. It is clear that if the proposed additional trackage would be an extension of its line of railroad, the appellant was not entitled to proceed with the construction before obtaining from the Interstate Commerce Commission the certificate prescribed by paragraph 18. It is equally clear that such certificate, or any action by, or permission of, the Commission, was not required if such trackage is within the meaning of the words "spur, industrial, team, switching or side tracks," as used in paragraph 22. The difficulty in reaching a satisfactory conclusion arises from the facts that the statute containing the paragraphs mentioned do not define the words used to describe the things dealt with in those paragraphs, respectively, and that the distinction between an extension by a carrier by railroad of its line of railroad and the adding thereto of spur or industrial tracks has not been authoritatively determined. The words "extension," "spur track," and "industrial track" have long been used to describe railroad constructions, but generally under circumstances not calling for

a statement of the distinguishing features of the things so referred to. While the statute, in its above-quoted provisions, palpably distinguishes between the main tracks of an interstate carrier and its spur, industrial, switching, or side tracks (R. R. Comm. v. Southern Pac. Co., 264 U. S. 331, 345, 44 S. Ct. 376, 68 L. Ed. 713), none of its provisions which has come to our notice indicate a legislative intention to require authorization by the Commission of the construction or abandonment of what, at the time of and prior to the enactment of the statute, was customarily called an industrial track. In the argument made in support of the appellee's contention, stress was laid on the amount and length of the proposed trackage, on its cost, on the facts that it was intended to serve five or more industries, that it would extend into an industrial district heretofore served by the appellee alone and which is much nearer to the latter's main line than to appellant's, that the probably resulting lessening of appellee's earnings would be out of proportion to a possible lessening of its operating expenses, that the principal proposed track would itself be equipped with and served by accessory tracks, that it would result in enabling the appellant to handle an additional amount of freight in excess of what might be expected to result from a considerable extension of appellant's main line into new territory not already industrially developed, and that, at comparatively small additional cost, the proposed trackage could be so changed, added to, and equipped as to be the means of the appellant conducting for the public a general business of carrying freight or passengers, or both freight and passengers.

Quite authentic evidence indicates that most of the above-mentioned features of the proposed construction are, under accepted usage, consistent with it being considered an industrial track. The opinion in Los Angeles Switching Case, 234 U. S. 294, 34 S. Ct. 814, 58 L. Ed. 1319, discloses that what was therein referred to as industry spurs included a track leading from the carrier's main track to an industry served which was seven miles distant from the main track, such industry spur branching at one or more points, short spurs running off to what was known as the "lead" to serve other industries in the immediate neighborhood. In the opinion in the case of Detroit, etc., Ry. v. Michigan Railroad Commission, 240 U. S. 564, 36 S. Ct. 424, 60 L. Ed. 802, the track dealt with was referred to as a "five-mile logging spur called Tubbs' Branch." In

the opinion in the case of Chicago, M. & St. P. Ry. v. Minneapolis Civic Ass'n, 247 U. S. 490, 501, 38 S. Ct. 553, 62 L. Ed. 1229, tracks located in the city of Minneapolis which served several large flour mills in that city were referred to as "obviously terminal or spur delivery tracks." The decision of the Supreme Court of Minnesota in the same case is reported in 134 Minn. 169, 158 N. W. 817. The decision in the case of R. R. Comm. v. Southern Pacific Ry., 264 U. S. 331, 346, 44 S. Ct. 376, 68 L. Ed. 713, shows that additional trackage which is not great in distance may be an extension of a carrier's line of railroad within the meaning of paragraph 18.

[2] Appellant's brief contains many references to court opinions, to actions by the Interstate Commerce Commission, and to state statutes, which indicate that such trackage as the appellant proposed to construct for use in the way above stated is customarily referred to as an industrial track. We think that the evidence as to the customary use of terms found in paragraph 22 warrants the conclusion that an "industrial track" is one which connects with a main line track of a carrier by railroad and is used, and equipped and intended for use, only in moving freight in carloads to or from one or more industries thereby reached and served, in incidental services such as loading, reloading, and storing, and in incidental switching or yard movements. There is a recognized distinction between main line movements of cars and switching, yard or terminal movements thereof, and between the different tracks respectively used in making such movements.

The above cited statute confers on the Interstate Commerce Commission power with reference to the construction or abandonment of an extension of a line of railroad of a carrier subject to the act to regulate commerce, and withholds like power as to the construction or abandonment of an industrial track of such a carrier located or to be located wholly within one state, without indicating that such trackage as to which power is withheld was intended to be other or different from what, at the time of the enactment of the statute, was customarily called an industrial track, or that the withholding of the power in such case was dependent or contingent upon the presence or absence of any or all of such features or circumstances as those above mentioned. In this situation, and for reasons above indicated, we are of opinion that the proposed trackage in question is such that the right

of the appellant to construct it is not dependent upon the appellant obtaining from the Interstate Commerce Commission a certificate of public necessity and convenience. A different conclusion was reached as to the proposed trackage which was in question in the case of Detroit & M. Ry. Co. v. Boyne City, G. A. R. Co. (D. C.) 286 F. 540. The facts in that case were somewhat similar to those presented in the instant case, but there are differences which may be regarded as material. It appears from the opinion in that case that in reaching a conclusion controlling influence was given to the fact that entire trains were proposed to be operated over the proposed track and the main line in continuous transportation and without switching movements or charges. The application of such a test seems hardly to be warranted, in view of the facts that it is not unusual for a train, after being made up and placed on a switching or side track constituting part of a station yard or terminal, to be moved from that place to the main line without switching and continued on its journey, and that switching or side tracks wholly within one state may be constructed by a carrier without permission from the Commerce Commission.

[3] It was suggested that the question presented should be considered in the light of the adoption of the policy, evidenced by provisions contained in the Transportation Act and the history of its enactment, of enabling the Interstate Commerce Commission to prevent an enlargement of a carrier's trackage upon consideration of the effect thereof upon other carriers and the public; the power conferred being a means of preventing duplication of railroad service and the increase of capital investment in railroad property, with the consequent addition to the burdens to be borne by carriers and ultimately by the public, when such results are deemed to be avoidable consistently with the interests of carriers affected and the public. Such a consideration cannot properly prevail in the case of a proposed enlargement of trackage which is found to be within the meaning of the explicit provision of the above-quoted paragraph 22. It is not for the courts, by giving to descriptive words used in that paragraph meanings narrower or less inclusive than such words customarily had at and prior to the date of the enactment, to reach the same result as would be effected by an amendment of the statute.

The decree is reversed.

And it is ordered that said cause be re-

manded to said District Court, with direction that the bill of complaint therein be dismissed.